# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | |
|---|---|
| Cary Ryals,                                    )<br>                                                )<br>             Plaintiff,                    )<br>                                                )<br>        v.                                     )<br>                                                )<br>ILA Local 1771 (Clerks & Checkers),             )<br>South Carolina Stevedores Association,          )<br>Ceres Marine Terminals, APM Terminals,          )<br>Ports America Stevedoring Contract              )<br>Company, and  SSA-Cooper                        )<br>Stevedoring Company,                            )<br>                                                )<br>             Defendants.                   )<br>_____)  | Case No.: 2:14-cv-443-DCN<br><br>**ORDER** |

This matter is before the court upon two motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The first motion was brought by Defendant ILA Local 1771 (Clerks and Checkers) ("Union" or "Local 1771"), and the second motion was brought by Defendants South Carolina Stevedores Association ("SCSA"), Ceres Marine Terminals, APM Terminals, Ports America Stevedoring Contract Company, and SSA/Cooper Stevedoring Company (collectively, "Employers"). For the reasons that follow, the court grants both motions.

## BACKGROUND

The following facts are drawn from plaintiff's complaint. Plaintiff Cary Ryals is a member of the International Longshoreman's Association and its local organization, Local 1771. Plaintiff has been a member in good standing since 1998. Local 1771 operates an exclusive hiring hall through which individuals may obtain employment as

1

clerks and checkers for the Employers. The Employers are members of the SCSA, an organization that represents Employers in all employment and labor matters within the Port of Charleston. Employees are hired based on seniority, which is determined by the number of hours an employee works during a contract year. The hiring system adopted by the Union and the Employers is governed by the Charleston Clerks and Checkers Seniority Plan ("Seniority Plan" or "Plan"). The Seniority Plan incorporates rules adopted by both the Union and the Employers regarding how employees are hired and how Union members are offered and assigned employment (respectively, "the Charleston Hiring Rules," and "the Calling Rules"). The Plan is a product of the collective bargaining relationship between the SCSA and Local 1771. The Plan's operation is governed by a board consisting of two representatives of the Employers and two representatives from the Union ("the Seniority Board" or "the Board"). "The Board's decisions are final and binding, with a failure to agree being subject to adjustment pursuant to the collective bargaining agreement." Compl. Ex. B at 1.

In 2007, the federal government mandated that all port longshore employees obtain a Transportation Workers Identification Credential card ("TWIC"). Plaintiff applied for a TWIC card in March 2008, but his request was denied. In October 2008, plaintiff was arrested on a felony offense of assault and battery with intent to kill. Although plaintiff's application for a TWIC card had been denied, he was able to work as a union employee, notwithstanding his felony arrest.

On May 27, 2009, plaintiff was involved in an automobile accident and was severely assaulted by a fellow union member. As a result of the accident and assault, plaintiff was out of work from May 2009 through August 2010. Plaintiff received

accident and sick pay benefits pursuant to section 7(A)(1) of the Seniority Plan[1] from May 31, 2009, through May 23, 2010.

On or about June 2, 2009, plaintiff informed the dispatcher that he was "marked off" until further notice in accordance with sections 1 and 3 of the Calling Rules.[2] Plaintiff believed that he would suffer no Union discipline until such time as he informed the Union to put him back on the calling roster. From 2009 until on or before January 28, 2013, plaintiff spoke with his Union representative on several occasions concerning the outstanding criminal charge and the impact it was having on his ability to work. He was informed by his Union representative that he could return to work as soon as he obtained a TWIC card.

Around November 2010, plaintiff again applied for a TWIC card; however, his application was denied as a result of the pending felony charge. Because he was denied security clearance, plaintiff was available for work but unable to work. On or about January 28, 2013, plaintiff's felony charge was resolved and he was allowed to obtain a TWIC card on July 17, 2013. Thereafter, plaintiff reported to the Union hall and requested that he be returned to the "call tape" for job assignment. Compl. ¶ 27.

On July 18, 2013, plaintiff contacted the dispatcher to find out why he had not been called for work. At that time, he was informed that he could not work until he was HAZMAT recertified and that he would have to wait for notice from the SCSA for

---

[1] "Persons shall receive credit for allowable breaks in service which are due to . . . [a]bsence due to sickness or injuries wherein the individual is eligible for workmen's compensation or for benefits under the Employers-I.L.A. Welfare Plan." Seniority Plan § 7(A)(1).

[2] "Each member shall be responsible to make themselves available to accept or decline all offers of employment. (Mark on, Mark off.)." Calling Rules § 1, ECF 1-4. "Any person that has not marked off will be offered or assigned a job in accordance with seniority, continuity or other mutually agreed contractual arrangements." Id. § 3.

HAZMAT recertification dates.  When plaintiff called the president of Local 1771 to schedule his HAZMAT recertification, plaintiff was informed that he would have to have his Union privileges reinstated.

On July 19, 2013, plaintiff wrote the SCSA to request a reinstatement hearing.  A hearing was held before the Seniority Board on August 1, 2013.  On August 20, 2013, plaintiff sent an email to Local 1771 in an effort to clarify his absence from the Union call list.  On August 26, 2013, plaintiff was notified by the Seniority Board that his seniority with the Union had ceased and would not be reinstated due to a violation of section 7(C)(4) of the Seniority Plan, which provides for termination for failure to make oneself available on a daily basis.

On August 28, 2013, plaintiff requested a detailed definition of the facts outlining when he was not available to work and the basis for the Seniority Board's decision.  On September 5, 2013, plaintiff received an email from the Seniority Board informing him that his seniority had been broken because he did not make himself available for work over a four-year period of time.  Plaintiff emailed the Union and the SCSA to request a detailed list of times that he was not available for work, as well as a reconsideration of the decision based upon erroneous information regarding his unavailability.  On September 10, 2013, plaintiff again emailed both the Union and the SCSA to notify them of his appeal of the decision not to reinstate him for employment.

On September 18, 2013, plaintiff received an email from the Seniority Board informing him that it was incumbent upon plaintiff to document his credited work hours. On September 27, 2013, plaintiff emailed the Seniority Board requesting a rehearing on his seniority classification termination, which request was denied by the Seniority Board

by email dated October 1, 2013. On November 4, 2013, plaintiff, through his attorney, again requested reconsideration of his seniority. On November 18, 2013, plaintiff's attorney received a response from the attorney for the Seniority Board informing plaintiff that the matter was being investigated. On February 11, 2014, plaintiff received a decision denying his request for reinstatement of his seniority classification.

Plaintiff filed the instant action on February 20, 2014, asserting that Employers and the Union have violated provisions of both the Labor Management Reporting and Disclosure Act ("the LMRDA") and the Labor Management Relations Act of 1947 ("the LMRA"). Plaintiff contends that his seniority was wrongfully terminated without notice or a hearing, and that Employers and Local 1771 violated the LMRDA and LMRA by failing to comply with the terms of the Seniority Plan.

On April 9, 2014, the Union and Employers filed separate motions to dismiss the complaint. Plaintiff responded to both motions on April 28, 2014. These matters have been fully briefed and are ripe for the court's review.

## STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted is a challenge to the legal sufficiency of a complaint. Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir. 2009); see also Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992) ("A motion to dismiss under Rule 12(b)(6) . . . does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."). To be legally sufficient, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. More specifically, to state a facially plausible claim the complaint must demonstrate that the plaintiff's right to relief is more than a mere possibility, but it need not rise to the level of evincing a probability of success. Id. Thus, a complaint must simply provide the defendant with "fair notice" of the claim and the grounds upon which the plaintiff seeks to obtain relief. E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 440 (4th Cir. 2011).

"Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679. "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678. However, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679. Thus, "[i]n ruling on a 12(b)(6) motion, a court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." Kensington Volunteer Fire Dep't, 684 F.3d at 467 (internal quotations omitted).

## ANALYSIS

Plaintiff pleads two separate causes of actions in his complaint. First, he claims that Local 1771 and the Employers violated sections 101(a)(5) and 609 of the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. §§ 411(a)(5) and 529, when the Seniority Board removed him from the seniority list without notice and a hearing. He also asserts a hybrid section 301 claim against Local 1771 and the Employers under the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, based on the same conduct. The court addresses these claims in turn.

### I.     LMRDA Claim

Plaintiff first alleges that the Employers and Local 1771 violated sections 101(a)(5) and 609 of the LMRDA when they discharged him from the seniority list. He argues that the discharge was a form of discipline and that he was entitled to, but did not receive, notice and a hearing prior to the discipline being imposed. Defendants move for dismissal on the grounds that these allegations fail to state a claim under either section of the LMRDA upon which plaintiff relies.

As the U.S. Court of Appeals for the Fourth Circuit long ago explained, "[i]t is abundantly clear that the Act does not give a cause of action against an employer. That was not the purpose or intent of this legislation." Duncan v. Pa. Shipbuilders Ass'n, 394 F.2d 237, 239 (4th Cir. 1968) (dismissing employer from suit where only a LMRDA claim was alleged against employer). Accordingly, Plaintiff has failed to state a claim for relief under the LMRDA against the Employers.

On the other hand, the LMRDA does reach union conduct. Section 101(a)(5) of the LMRDA provides:

> No member of any labor organization may be fined, suspended, expelled, or *otherwise disciplined* except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

29 U.S.C. § 411(a)(5) (emphasis added).[3] Plaintiff contends that the Union "otherwise disciplined" him when the Union, acting through the Seniority Board, terminated his seniority classification. The court disagrees.

The Supreme Court has explained that "otherwise discipline" as used in sections 101(a)(5) and 609 "denote[s] only punishment authorized by the union as a collective entity to enforce its rules." Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6, 493 U.S. 67, 91 (1989). In other words, "'discipline' refers to punishment that a union can impose by virtue of its own authority over its members." Id. As plaintiff acknowledges in his response, because the Seniority Board is made up of equal representatives of the Employers and the Union, the Seniority Board's decision not to reinstate Plaintiff's seniority classification was a joint decision made by both the Employers and the Union. Because the Union cannot act unilaterally to terminate a member's seniority status but rather must act in conjunction with the Employers through the Seniority Board, plaintiff's termination cannot be considered "punishment that a union can impose by virtue of its own authority over its members" and for the purpose of enforcing its own rules. Breininger, 493 U.S. at 91. Accordingly, the court concludes that the termination of plaintiff's seniority classification was neither "discipline" by the Union nor subject to the protections of the LMRDA.

---

[3] Section 609 similarly provides: "It shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or *otherwise discipline* any of its members for exercising any right to which he is entitled under the provisions of this chapter." 29 U.S.C. § 529 (emphasis added).

Other courts that have considered joint actions made by a union and an employer have likewise concluded that such acts do not fall under the protections of sections 101(a)(5) and 609. For instance, in a case quite similar to the case at bar, a California federal district court considered the issue of "whether § 411(a)(5) should be deemed applicable to a committee set up under a collective bargaining agreement in which a union has the duty and power to share in the enforcing of the on the job rules and discipline." Hall v. Pac. Mar. Ass'n, 281 F. Supp. 54, 58 (N.D. Cal. 1968). The Hall court explained that the union in that case derived its power "from what is a common form of grievance machinery, a committee with representatives of both management and labor sitting on it, each side having equal vote." Id. The court found "nothing in § 411 which would indicate that Congress intended to write the procedural guarantees into grievance machinery set up under a collective bargaining agreement simply because the union participated in that grievance machinery and there was the possibility of abusing that power." Id. (explaining that "all the subsections of § 411 provide for the protection of a member's rights within the internal labor organization framework, and none of them even refer to a collective bargaining agreement"). The court thus concluded that "§ 411(a)(5) does not apply to the procedures used by the Joint Port Committee and that plaintiffs [did] not state a cause of action under 29 U.S.C. § 411(a)(5)."[4]

---

[4] See also Hackenburg v. Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers, Local 101 Thereof, 694 F.2d 1237, 1239–40 (10th Cir. 1982) (holding, in a case involving not "intra-union politics" but rather "a matter of an employer requiring the Union to carry out the penalty provision of a collective bargaining agreement," that the statutory term "otherwise disciplined" is narrowly confined "to regulatory actions that affect a union member's rights or status as a member of the union," that the sanctions imposed were employment-related rather than "internal union" related, and that "the safeguards in § 411(a)(5) [were] not available" for such action).

9

Plaintiff's LMRDA claim is based on alleged violations of sections 101(a)(5) and 609 by the Union for failing to provide notice and a hearing prior to the Seniority Board's decision to terminate his seniority classification. The Seniority Board is a committee set up under a collective bargaining agreement with representatives of both the Union and the Employers sitting on it, each side having equal vote. Actions taken by the Union through the Seniority Board do not involve intra-union politics or punishment, and the Union's power to terminate a member's seniority classification derives not from the Union's own authority over its members but rather from its role on the collectively-bargained-for joint committee. The court concludes that the Union's actions through the Seniority Board are not governed by sections 101(a)(5) and 609.

For all these reasons, the court finds that plaintiff's complaint does not state a cause of action under the LMRDA.

## II.    LMRA Claims

Plaintiff also alleges a claim against the Employers pursuant to section 301 of the LMRA[5] for breach of contract and a claim against the Union for breach of its duty of fair representation. "This is a so-called 'hybrid 301' action, where in order to prevail on the merits against either party, an employee must prove *both* 1) that the union breached its duty of fair representation and 2) that his employer violated the collective bargaining agreement." Thompson v. Aluminum Co. of Am., 276 F.3d 651, 656 (4th Cir. 2002) (citing DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 164–65 (1983)). Because both claims must be met, the failure to establish one claim is fatal to the entire hybrid

---

[5]    Section 301 provides: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. § 185(a).

action.  See Courie v. Alcoa Wheel & Forged Products, 577 F.3d 625, 631 (6th Cir. 2009) ("Both halves are essential."); see also Thompson, 276 F.3d at 656 (explaining that although both claims are brought in one suit, "a cause of action will only lie against an employer if the union has breached its duty of fair representation of the employee").  The court first addresses plaintiff's claim against the Employers.

### A.  Claim that the Employers Violated the Seniority Plan

In his complaint, plaintiff alleges that the Employers breached the Seniority Plan by terminating plaintiff's seniority classification in its entirety.  The Employers move to dismiss the section 301 claim against them, arguing that the Seniority Board's decision was based on the clear language of the Seniority Plan.  Plaintiff responds that the provisions of the Seniority Plan are not clear, and he argues that the Employers breached the Plan when they applied section 7(C)(4) instead of section 7(C)(3).[6]

Section 7(C) of the Seniority Plan provides that the "Seniority of any individual shall cease in the event he or she: (1) Voluntarily quits or resigns with written notification[;] (2) Retires[;] (3) See #6, Page 9 [i.e., section 6;] (4) Fails to make himself/herself available on a daily basis, not to include 7(A) above."  Seniority Plan § 7(C).  According to the allegations in the complaint, plaintiff did not make himself available for work on a daily basis for over four years.  Thus, unless one of the

---

[6] The complaint also alleges that the Employers violated section 2(K)(8) of the Seniority Plan by discharging plaintiff for deliberately violating the Hiring Rules without first providing him with notice and a hearing.  For this proposition, plaintiff relies only on section 5 of the Hiring Rules, which provides that "Casual employees can only turn down calls in accordance with the rules established by the Seniority Board or their casual group."  However, Plaintiff does not allege that he is a casual employee, and the exhibits attached to the Complaint make clear that Plaintiff was not a "casual employee," but instead was a member of Seniority Group N.  Moreover, the Seniority Board's decision does not mention the Hiring Rules but rather relies on section 7(C)(4) of the Seniority Plan.  Accordingly, the court concludes that plaintiff has failed to allege facts sufficient to state a claim upon which relief can be granted based on section 2(K)(8).

permissible absences listed in section 7(A) applies, plaintiff's seniority ceased pursuant to section 7(C)(4).

Pursuant to section 7(A), employees "shall receive credit for allowable breaks in service" for the following reasons:

> (1) Absence due to sickness or injuries wherein the individual is eligible for workmen's compensation or for benefits under the Employers-I.L.A. Welfare Plan[;] (2) Absence due to military (reserve) service[;] (3) Absence due to a period of service as an officer of the I.L.A. or any of its subdivision[;] (4) Absence due to service as an employee of the Employers – ILA Pension, Welfare and Vacation Fund[;] (5) Leave of absence, *with written notice to the Seniority Board*, for a period not to exceed 1 year. Seniority Board approval will be required for a leave beyond one year for reasons other than those listed in Sub-Paragraph (1)–(4) above.

Seniority Plan § 7(A). There are no allegations in the complaint to support application of subparts (2) – (4). Accordingly, plaintiff was to receive credit for allowable breaks, if at all, only for an allowable break for which he was eligible for sick or disability benefits or for an allowable break for which he provided written notice to the Seniority Board.

According to the complaint, plaintiff was "marked off" from the call list from June 2, 2009, until July 17, 2013. He received accident and sick pay benefits from May 31, 2009, through May 23, 2010. Therefore, drawing all inferences in plaintiff's favor, this one-year period was an allowable break in service, pursuant to section 7(A)(1), during which his seniority classification did not change. However, there are no allegations in the complaint that plaintiff received sick and accident benefits during the period between May 24, 2010, and July 17, 2013. Thus, for section 7(A)(5) to apply to this three-year period, the complaint must allege that plaintiff provided written notice to

12

the Seniority Board and that the Seniority Board approved the extended leave. The complaint's allegations do not make the necessary showing.

Plaintiff does not allege that he provided, or even attempted to provide, written notice to the Seniority Board regarding his extended leave of absence. He does not allege that he ever sought or secured the approval of the Seniority Board for an absence of more than one year. Instead, he merely alleges that he informed the dispatcher on June 2, 2009, that he was marked off until further notice. However, under the clear terms of the Seniority Plan, this communication is insufficient to receive the protections of section 7(A)(5). Written notice to the Seniority Board is required, and plaintiff's oral communication with the dispatcher in no way satisfied the requirement.

In both his complaint and his response, Plaintiff argues that section 7(C)(3), rather than section 7(C)(4), should have been applied to his situation. Section 7(C)(3) cross-references section 6 as providing a situation in which an employee's seniority "shall cease." Seniority Plan § 7(C)(3). Section 6 of the Seniority Plan provides:

> In order to maintain the integrity of the true seniority system currently in place any person who fails to work the required number of hours (700 per contract year) will drop 5 seniority spots. As an example Group O has 14 members. If the No. 1 person in Group O does not work 700 hours, he/she will drop to the No. 6 position in that Group. If a Group has less than 5 persons assigned to it or if a person is at the bottom of a particular Group and does not maintain 700 hours in a contract year, he/she will be placed at the appropriate spot in the next lowest Seniority Group. *When you drop to the last rated Group and fail to make the minimum number of hours you will be permanently removed from the Group Roster.*

Id. § 6 (emphasis added). According to plaintiff, the Seniority Board should have applied the cross-reference in section 7(C)(3) to his situation, which he contends would have

resulted in his seniority classification dropping five seniority spots rather than a total termination of his seniority.

Plaintiff's argument appears to be that before the Seniority Board can apply section 7(C)(4), the Seniority Board must first apply section 6, as cross-referenced by section 7(C)(3). However, section 7(C)(3) does not trigger the application of section 6; instead, it explains that an employee's seniority "shall cease" when he has dropped to the last rated Group, fails to work 700 hours in a contract year, and is permanently removed from the Group Roster. Moreover, if section 6 had to be exhausted prior to the application of section 7(C)(4), as plaintiff seems to argue, then section 7(C)(4) would never be operative because seniority would cease pursuant only to section 7(C)(3). Contracts are to be read to give meaning to all terms, and the court will not strain to interpret a contract in such a way as to render a clause superfluous. See Restatement (Second) of Contracts § 203 (1981) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect."); see also Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co., 118 F.3d 1018, 1025 (4th Cir. 1997) ("Traditional rules of contract construction . . . apply to collective bargaining agreements . . . when they do not conflict with federal labor law.").

The Seniority Plan clearly provides that an employee's seniority "shall cease" if any one of four enumerated events occurs. The complaint's allegations make clear that plaintiff "fail[ed] to make himself . . . available on a daily basis," Seniority Plan § 7(C)(4), and failed to give written notice to and receive approval from the Seniority Board for his leave of absence, id. § 7(A)(5)(A). Thus, the alleged facts demonstrate that

plaintiff's seniority automatically ceased pursuant to the plain terms of the Seniority Plan, as the Seniority Board explained in its denial of plaintiff's request to reinstate his seniority. Because none of the allegations in the complaint are sufficient to state a plausible claim against the Employers for breach of the Seniority Plan, the court dismisses the section 301 cause of action against the Employers.

### B. Claim that the Union Breached its Duty of Fair Representation

Plaintiff also alleges that Local 1771 breached its duty of fair representation when the Seniority Board discharged him from the seniority list in violation of section 6 of the Seniority Plan. According to plaintiff, he should have been restored to his prior seniority classification because he had been unable to work for reasons beyond his control and because he had notified the Union by telling a dispatcher to mark him off from work until further notice. Plaintiff alleges that the Union's participation in the decision not to restore his seniority classification was arbitrary, discriminatory, and in bad faith. Finally, he alleges that the decision constitutes discipline that entitled him to notice and a hearing before the change in his classification. Because the section 301 claim against the Employers fails, the section 301 claim against the Union must also fail. However, as explained below, even if plaintiff had stated a viable claim against the Employers, he has failed to state a plausible section 301 claim against Local 1771.

"It is well established that unions, as exclusive bargaining agents in the negotiation, administration and enforcement of collective bargaining agreements, have an implicit duty to serve the interests of all members without hostility or discrimination toward any, to exercise their discretion with complete good faith and honesty, and to avoid arbitrary conduct." Thompson, 276 F.3d at 657 (quotation marks omitted). A

union breaches its duty of fair representation when its conduct toward a bargaining unit member is "arbitrary, discriminatory, or in bad faith." Vaca v. Sipes, 386 U.S. 171, 190 (1967). "Whether a union acted arbitrarily, discriminatorily or in bad faith requires a separate analysis, because each of these requirements represents a distinct and separate obligation." Thompson, 276 F.3d at 657. "To be 'arbitrary,' a union's conduct towards its member must be so far outside a wide range of reasonableness that it is wholly irrational." Id. (citing Air Line Pilots Ass'n v. O'Neill, 499 U.S. 65, 78 (1991)). While the arbitrariness analysis considers the objective adequacy of the union's conduct, the discrimination and bad-faith analyses focus on the subjective motivation of the union officials. Id. "[M]ere negligence, even in the enforcement of a collective-bargaining agreement, would not state a claim for breach of the duty of fair representation." United Steelworkers of Am., AFL-CIO-CLC v. Rawson, 495 U.S. 362, 372–73 (1990).

  Plaintiff's allegations make clear that the Seniority Board, and not Local 1771 alone, made the decision not to reinstate his seniority classification. According to plaintiff, the Union's failure to insist that the Seniority Board apply section 6 instead of section 7(C)(4) was "grossly deficient" conduct "in reckless disregard of Plaintiff's rights under the [collective bargaining agreement]." Pl.'s Resp. Mem. 10, ECF 13. The court disagrees. The Seniority Board's decision was not arbitrary because the decision was based on and plaintiff's failure to abide by the the unambiguous language of the Seniority Plan. As explained above, the Seniority Board properly relied on section 7(C)(4) of the Plan in determining that plaintiff's seniority status had ceased due to his extended absence. There is likewise no merit in plaintiff's argument that the Seniority Board should have applied section 6 to his situation. Drawing all inferences in plaintiff's favor,

the court concludes that none of the allegations supports a finding that the "union's conduct towards [plaintiff was] so far outside a wide range of reasonableness that it [was] wholly irrational." See Thompson, 276 F.3d at 657. The court thus finds that plaintiff's allegations cannot establish that the Union's actions were arbitrary.

Moreover, none of the allegations in the complaint support a finding that the Union's actions were discriminatory. A union "may not discriminate against any member of the union or treat some members with hostility while favoring others." Smith v. Local 7898, United Steelworkers of Am., 834 F.2d 93, 96 (4th Cir. 1987). The complaint is devoid of any facts showing that the Union acted in a discriminatory manner or treated plaintiff with hostility while favoring other Union members. Although plaintiff alleges that he believed that, in "accordance with past port practice," he would not suffer Union discipline as a result of marking off, Compl. ¶ 24, he alleges no facts describing the past port practice or demonstrating that the Union has ever treated other members more favorably as a result of this past practice. Accordingly, the court finds plaintiff's allegations insufficient to establish that the Union's actions were discriminatory.

Finally, there are no allegations in the complaint to support a finding that the Union acted in bad faith. "Honesty and good faith are demanded of [a union], but as long as there are those ingredients in its conduct, a union has broad discretion in treating competing interests of members of the bargaining unit." Smith, 834 F.2d at 96. A claim that a union acted in bad faith thus "requires a showing of fraudulent, deceitful, or dishonest action." Sim v. N.Y. Mailers' Union No. 6, 166 F.3d 465, 472 (2d Cir. 1999). Although plaintiff suggests that Union representatives were dishonest when they told him that he could return to work once he received his TWIC card, the court finds nothing

dishonest about this statement. While plaintiff no longer has seniority, he is still eligible to work under the terms of the Seniority Plan, which provides that "[p]ersons having no seniority status shall be offered employment only after all available Group/Rated persons have been offered employment." Seniority Plan § 8. Accordingly, the court finds that plaintiff has failed to state a claim that the Union acted in bad faith.

Because the allegations in the complaint do not support a finding that the Union's conduct toward plaintiff was arbitrary, discriminatory, or in bad faith, the court concludes that plaintiff's allegations fail to state a plausible claim that the Union breached its duty of fair representation.

For all of these reasons, the court dismisses the section 301 claim in its entirety.

## CONCLUSION

For the foregoing reasons, the court **GRANTS** the defendants' motions to dismiss, ECF Nos. 7 & 9. The complaint is **DISMISSED WITH PREJUDICE**.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**July 16, 2014**
**Charleston, South Carolina**